**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DAVID AUSTIN LINDSEY,

      Plaintiff,

v.

FEDERAL BUREAU OF
INVESTIGATION,

      Defendant.

Civil Action No. 16-2032 (CKK)

**MEMORANDUM OPINION**
(September 18, 2020)

This Freedom of Information Act ("FOIA") matter concerns Plaintiff's request to Defendant Federal Bureau of Investigation ("FBI") for the disclosure of "all FBI records of contact between Imad Hage and U.S. government officials."  Compl., ECF No. 1, ¶ 1.  The Court previously discussed the background relevant to this case in its September 20, 2017 Memorandum Opinion and Order, to which it refers the reader.  *See Lindsey v. Fed. Bureau of Investigation*, 271 F. Supp. 3d 1, 3 (D.D.C. 2017).

In short, Plaintiff initially submitted his FOIA request on May 18, 2016, and Defendant denied that request on June 23, 2016, and issued a privacy *Glomar* response neither confirming nor denying the existence of any records responsive to Plaintiff's response.  *Id.* at 3.  The Court previously found that Defendant's prior affidavit was insufficient to warrant summary judgment on the basis of its initial *Glomar* response and denied without prejudice the parties' cross-motions for summary judgment.  *Id.*  The Court accordingly provided Defendant an opportunity to supplement its affidavit or to pierce the *Glomar* veil and conduct a search for relevant, nonexempt materials.  *Id.* at 9.

1

Consequently, Defendant processed and released two pages of records related to a certain incident involving Mr. Hage that took place at the Dulles Airport in January 2003, about which some information was in the public record.  Def.'s Stmt. ¶¶ 5, 8; Pl.'s Stmt. at 1 (admitting these paragraphs).  Defendant further issued a second *Glomar* response neither confirming nor denying the existence or non-existence of any other responsive records.  Def.'s Stmt. ¶ 9; Pl.'s Stmt. at 1 (admitting relevant sentence of paragraph).  Now pending before the Court are the parties' renewed cross-motions for summary judgment regarding Defendant's search, production, and second *Glomar* response.

Upon consideration of the pleadings,[1] the relevant authorities, and the record as a whole, the Court **GRANTS** Defendant's Renewed Motion for Summary Judgment, ECF No. 20, and **DENIES** Plaintiff's Renewed Motion for Summary Judgment, ECF No. 22.

---

[1] The Court's consideration has focused on the following documents:

- Def.'s Renewed Mot. for Summ. J. ("Def.'s Mot."), ECF No. 20;
- Mem. of P. & A. in Supp. of Def.'s Renewed Mot. for Summ. J. ("Def.'s Mem."), ECF No. 20-1;
- Def.'s Stmt. of Material Facts as to Which There Is No Genuine Issue to Be Tried ("Def.'s Stmt."), ECF No. 20-2;
- Second Decl. of David M. Hardy ("Second Hardy Decl."), ECF No. 20-3;
- Notice of *In Camera, Ex Parte* Submission, ECF No. 21, and the referenced *in camera*, *ex parte* submission;
- Pl.'s Renewed Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 22;
- Pl.'s Mem. in Opp'n to Def.'s Renewed Mot. for Summ. J., and in Supp. of Pl.'s Renewed Mot. for Summ. J. ("Pl.'s Opp'n and Mem."), ECF No. 23;
- Pl.'s Stmt. of Material Facts to Which There Is No Genuine and Resp. to Def.'s Stmt. of Material Facts Not in Genuine Issue ("Pl.'s Stmt."), ECF No. 22-1;
- Def.'s Opp'n to Pl.'s Cross-Mot. for Summ. J. and Reply in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Opp'n and Reply"), ECF No. 24;
- Pl.'s Reply Mem. in Supp. of Pl.'s Renewed Mot. for Summ. J. ("Pl.'s Reply"), ECF No. 27;
- Pl.'s Notice of Suppl. Auth. ("Pl.'s Notice"), ECF No. 30; and
- Notice to the Ct. ("Def.'s Notice"), ECF No. 31.

In an exercise of its discretion, the Court finds that holding oral argument would not be of assistance in rendering a decision.  *See* LCvR 7(f).

# I. LEGAL STANDARD

Congress passed FOIA to "'open[] up the workings of government to public scrutiny' through the disclosure of government records." *Stern v. Fed. Bureau of Investigation*, 737 F.2d 84, 88 (D.C. Cir. 1984) (quoting *McGehee v. Cent. Intelligence Agency*, 697 F.2d 1095, 1108 (D.C. Cir. 1983)).  Congress, however, also recognized "that there are some government records for which public disclosure would be so intrusive—either to private parties or to certain important government functions—that FOIA disclosure would be inappropriate." *Id.*  To that end, FOIA "mandates that an agency disclose records on request, unless they fall within one of nine exemptions." *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011).  Despite these exemptions, "disclosure, not secrecy, is the dominant objective of the Act." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976).  The exemptions are therefore "'explicitly made exclusive' and must be 'narrowly construed.'" *Milner*, 562 U.S. at 565 (citations omitted) (quoting *Envtl. Prot. Agency v. Mink*, 410 U.S. 73, 79 (1973); *Fed. Bureau of Investigation v. Abramson*, 456 U.S. 615, 630 (1982)).

When presented with a motion for summary judgment in this context, the court must conduct a de novo review of the record.  5 U.S.C. § 552(a)(4)(B).  This requires the court to "ascertain whether the agency has sustained its burden of demonstrating the documents requested are . . . exempt from disclosure under the FOIA." *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1227 (D.C. Cir. 2008) (internal quotation marks omitted).  "An agency may sustain its burden by means of affidavits, but only 'if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" *Id.* (quoting *Gallant v. Nat'l Labor Relations Bd.*, 26 F.3d 168, 171 (D.C. Cir. 1994)).  "If an agency's affidavit describes the justifications for

withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *Am. Civil Liberties Union v. U.S. Dep't of Defense*, 628 F.3d 612, 619 (D.C. Cir. 2011).  "Uncontradicted, plausible affidavits showing reasonable specificity and a logical relation to the exemption are likely to prevail." *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 509 (D.C. Cir. 2011).

Summary judgment is proper when the pleadings, the discovery materials on file, and any affidavits or declarations "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## II. DISCUSSION

There are two sets of disputes between the parties.  First is whether Defendant's second *Glomar* response was justified.  *See* Def.'s Mem. at 19–33; Pl.'s Opp'n and Mem. at 10–14.  The second set includes three distinct issues: (1) whether the scope of Defendant's search relating to the January 2003 Dulles Airport incident was too narrow, (2) whether Defendant's search itself was adequate, and (3) whether the Court should examine *in camera* approximately 400 pages of acknowledged records that Defendant ultimately did not produce on the basis that they are not responsive.  *See* Def.'s Mem. at 7–19; Pl.'s Opp'n and Mem. at 6–10.  The Court considers each issue in turn below.

### A. Defendant's Second *Glomar* Response

In this case, Defendant has issued a second *Glomar* response, indicating that it could neither confirm nor deny the existence of any documents responsive to Plaintiff's FOIA request. This type of response is appropriate in "certain cases, [where] merely acknowledging the existence

of responsive records would itself cause harm cognizable under a FOIA exception." *People for the Ethical Treatment of Animals v. NIH* ("*PETA*"), 745 F.3d 535, 540 (D.C. Cir. 2014) (internal quotation marks and original alteration omitted); *see Bartko v. United States Dep't of Justice*, 898 F.3d 51, 63 (D.C. Cir. 2018) ("A *Glomar* response to a FOIA request is permitted in that rare situation when either confirming or denying the very existence of records responsive to a request would 'cause harm cognizable under an FOIA exception.'" (quoting *Roth v. Dep't of Justice*, 642 F.3d 1161, 1178 (D.C. Cir. 2011))).  "[T]o the extent the circumstances justify a *Glomar* response, the agency need not conduct any search for responsive documents or perform any analysis to identify segregable portions of such documents." *People for the Ethical Treatment of Animals*, 745 F.3d at 540.

A *Glomar* response "is proper if the fact of the existence or nonexistence of agency records falls within a FOIA exemption." *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007). "When addressing an agency's *Glomar* response, courts must accord 'substantial weight' to agency determinations." *Sea Shepherd Conservation Soc'y v. IRS*, 208 F. Supp. 3d 58, 89 (D.D.C. 2016) (citing *Gardels v. CIA*, 689 F.2d 1100, 1104 (D.C. Cir. 1982)). Consequently, in such cases, "courts may grant summary judgment on the basis of agency affidavits that contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Elec. Privacy Info. Ctr. v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012) (internal quotation marks omitted).  "The supporting affidavit must justify the *Glomar* response based on general exemption review standards established in non-*Glomar* cases." *Id.* (internal quotation marks omitted).  Ultimately, "an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Id.* (citation omitted).

Plaintiff argues that Defendant's second *Glomar* response was overbroad and that it has not sustained its burden to demonstrate that it was justified. Defendant's second *Glomar* response was issued with respect to any requested records except the acknowledged records of the January 2003 Dulles Airport incident. Second Hardy Decl. ¶ 9. Defendant has submitted the Second Hardy Declaration to support its refusal to either confirm or deny the existence or non-existence of any records responsive to Plaintiff's request, save for those acknowledged and processed. *See id*. The Court also acknowledges that it has received the *In Camera*, *Ex Parte* Declaration of David M. Hardy. *See* Notice of *In Camera, Ex Parte* Submission, ECF No. 21. Defendant's *Glomar* response was issued on the basis that acknowledging the existence or non-existence of records responsive to parts of Plaintiff's request, other than those acknowledged, "would trigger harms protected by FOIA Exemptions 1, 3, 6, and 7(C)." Second Hardy Decl. ¶ 9. The Court finds that Defendant's second *Glomar* response was justified under Exemptions 1, 3, and 7(C).[2]

### 1. Exemption 1

FOIA Exemption 1 includes matters that are "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign

---

[2] In his Reply, Plaintiff also provides a declaration filed by Mr. Hage in a criminal case in the United States District Court for the Eastern District of Virginia (*United States v. Imad Hage*, Crim. Action No. 04-162). Pl.'s Reply Ex. 1, ECF No. 27-1. Plaintiff's arguments based on this declaration discuss only FOIA exemptions related to privacy—Exemptions 6 and 7(C)—and the Court therefore addresses this argument in a separate section below. *See* Pl.'s Reply at 3–4. However, the Court notes here that it does not read Plaintiff's Reply as arguing that Defendant has waived Exemptions 1 and 3 through official acknowledgement of any records. Even if he did intend to so argue, it is unclear how the declaration could satisfy the official acknowledgement standard, *see Moore v. C.I.A.*, 666 F.3d 1330, 1333 (D.C. Cir. 2011) (explaining official acknowledgement in FOIA context); *Mobley v. C.I.A.*, 806 F.3d 568, 583 (D.C. Cir. 2015) ("The plaintiff bears the burden of identifying specific information that is already in the public domain due to official disclosure."), especially because "the fact that information exists in some form in the public domain does not necessarily mean that official disclosure will not cause harm cognizable under a FOIA exemption," *Wolf*, 473 F.3d at 378.

policy" and "are in fact properly classified pursuant to such Executive order."   5 U.S.C.
§ 552(b)(1).    Defendant justifies its *Glomar* response under Exemption 1 based on the
classification criteria of Executive Order 13526.  *See* Def.'s Mem. at 27; Exec. Order No. 13526,
75 FR 707 (Dec. 29, 2009).  Executive Order 13526 allows an original classification authority to
classify information only if the below conditions are satisfied:

> (1) an original classification authority is classifying the information;
> (2) the information is owned by, produced by or for, or is under the control of the
> United States Government;
> (3) the information falls within one or more of the categories of information listed
> in section 1.4 of this order; and
> (4) the original classification authority determines that the unauthorized disclosure
> of the information reasonably could be expected to result in damage to the national
> security, which includes defense against transnational terrorism, and the original
> classification authority is able to identify or describe the damage.

75 FR at 707, Exec. Order. 13526 § 1.1(a).  Section 1.4 of Executive Order 13526 has listed in its
categories of information "intelligence activities (including covert action), intelligence sources or
methods, or cryptology" as well as "foreign relations or foreign activities of the United States,
including confidential sources."   75 FR at 708, Exec. Order 13526 §§ 1.4(c)–(d).  Section 3.6
further provides that "[a]n agency may refuse to confirm or deny the existence or nonexistence of
requested records whenever the fact of their existence or nonexistence is itself classified under this
order or its predecessors."  75 FR at 718–19, Exec. Order 13526 § 3.6.

   "Because courts lack the expertise necessary to second-guess such agency opinions in the
typical national security FOIA case," the Court "must accord substantial weight to an agency's
affidavit concerning the details of the classified status of the disputed record."  *Am. Civil Liberties
Union v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011) (internal quotation marks and
citations omitted).  "Moreover, a reviewing court 'must take into account . . . that any affidavit or
other agency statement of threatened harm to national security will always be speculative to some

extent, in the sense that it describes a potential future harm.'" *Id.* (quoting *Wolf*, 473 F3d at 374). And "the Supreme Court has recognized the broad sweep of 'intelligence sources' warranting protection in the interest of national security." *Wolf*, 473 F.3d at 375. "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (internal quotation marks omitted).

Here, Defendant has submitted two declarations from David M. Hardy. The public Second Hardy Declaration asserts that Mr. Hardy's responsibilities include "the review of FBI information for classification purposes as mandated by Executive Order 13526" and that he has "been designated by the Attorney General of the United States as an original classification authority and a declassification authority pursuant to Executive Order 13526." Second Hardy Decl. ¶ 2. First and foremost, the Declaration asserts that, "[c]onsistent with Executive Order 13526," Mr. Hardy has "determined that the existence or nonexistence of requested records is a properly classified fact that concerns sections 1.4(c) ('intelligence sources or methods') and 1.4(d) ('foreign relations or foreign activities of the United States')." *Id.* ¶ 22. It also asserts that "[t]his fact constitutes information that is owned by and under the control of the U.S. Government, the unauthorized disclosure of which reasonably could be expected to result in damage to national security." *Id.*

As to the *Glomar* response issued here, the Declaration provides that if Defendant had records responsive to Plaintiff's request seeking "records regarding a foreign national's correspondence with U.S. government officials concerning U.S. foreign policy," those records "would be compiled in accordance with the FBI's law enforcement and/or intelligence gathering missions," and as a result, "revealing that records do/not exist would reveal the FBI does/does not have an investigative interest in the subject matter at issue." *Id.* ¶ 18. And "if records did exist, they would likely implicate FBI efforts to investigate threats to national security and/or gather

foreign intelligence." *Id.* At bottom, the Declaration explains, "[c]onfirming or denying the existence or nonexistence of FBI records of this nature," which are "any records the FBI may or may not have compiled while carrying out its responsibilities to investigate threats to national security and gather foreign intelligence," would in fact "reveal classified intelligence sources and methods, as well as U.S. foreign relations and foreign activities, the disclosure of which reasonably could be expected to cause damage to the national security of the" United States. *Id.* ¶ 17.

The Declaration also addresses specifically the determination that unauthorized disclosure could be expected to result in damage to national security by revealing intelligence sources and methods. First, it provides definitions for the relevant terms under Executive Order 13526 § 1.4(c). It defines intelligence activity as including "any intelligence action or technique utilized by the FBI against a targeted individual or organization that has determined to be of national security interest." *Id.* ¶ 25. It then defines intelligence methods as indicating "any procedure (human or non-human) utilized to obtain information concerning such individual or organization." *Id.* These two categories have "two characteristics": (1) the activity or method, plus the information generated by it, "is needed by U.S. Intelligence/Counterintelligence agencies to carry out their missions," and (2) "confidentiality must be maintained with respect to the activity or method if the viability, productivity and usefulness of its information is to be preserved." *Id.*

In light of "the subject matter of Plaintiff's request," which relates to a foreign national, Defendant has found "that if responsive records exist, at least a portion could pertain to FBI efforts to investigate threats to national security and/or gather foreign intelligence." *Id.* ¶ 28. Denying or confirming the existence of "these types of records" could "implicat[e] intelligence sources and methods," which could "reasonably be expected to cause damage to national security" and/or

"harm the effectiveness of intelligence sources and methods." *Id.* The Declaration provides an illustrative example:

> For example, if the FBI revealed it had an investigative interest in Mr. Hage's international dealings, it could be revealing some sort of intelligence gathering initiative to predict and thwart national security threats posed by Mr. Hage himself, his international contacts, or the countries on whom he was providing information. This would likely compromise classified FBI intelligence sources and methods by exposing their existence and purpose, and allowing nefarious foreign entities to predict and thwart their use. On the other hand, a denial of records would reveal to hostile foreign actors associated with these records the FBI has not detected any sort of threat. This would provide hostile enemies assurance the FBI is not alerted to the threats they pose, and allow them to continue to subvert U.S. national security without fear of FBI interference. . . . If the information were to exist, it would be classified and the release of such information would reveal intelligence activities and methods used by the FBI against targets who are the subject of foreign counterintelligence investigations or operations; identify a target of a foreign counterintelligence investigation; or disclose the intelligence gathering capabilities of the activities or methods directed at foreign targets.

*Id.*

In addition to the damage that could reasonably result regarding intelligence sources and methods, the Second Hardy Declaration outlines the harm to foreign relations that might reasonably result from confirming or denying the existence of records in response to Plaintiff's request. It first asserts that this information, which includes information relating to confidential sources, "is sensitive due to the delicate nature of international diplomacy, and must be handled with care so as not to jeopardize the fragile relationships that exist between the U.S. and certain foreign governments." *Id.* ¶ 29. Because, the Declaration explains, "Mr. Hage is a foreign citizen who Plaintiff states provided the U.S. government information relevant to U.S. foreign policy, acknowledging the existence/non-existence of FBI records on this subject could potentially reveal information" that would harm the United States' relations with other countries. *Id.* Like with the harm to intelligence gathering sources and methods, the Declaration provides further detail in the form of a hypothetical:

> For example, revealing records exist would likely reveal FBI investigative interest on a foreign national; or would reveal an FBI investigative interest in the international dealings Mr. Hage was allegedly involved with, possibly implicating FBI interest in the activities of foreign/nations actors. The unauthorized disclosure of such information concerning foreign relations or foreign activities of the U.S. can reasonably be expected to: 1) lead to diplomatic or economic retaliation against the U.S.; 2) identify the target, scope, or time frame of intelligence activities of the U.S. in or about a foreign country, resulting in the curtailment or cessation of these activities; 3) enable hostile entities to assess U.S. intelligence gathering activities in or about a foreign country and devise countermeasures against these activities; or 4) compromise cooperative foreign sources, which may jeopardize their safety and curtail the flow of information from these sources. Conversely, denying the existence of such records could indicate to nefarious foreign state actors the FBI has not detected their activities aimed at harming the national security of the U.S. This could embolden these actors to continue their activities unabated, further degrading U.S. national security.

*Id.*

"In light of the substantial weight accorded agency assertions of potential harm made in order to invoke the protection of FOIA Exemption 1," *Wolf*, 473 F.3d at 376, and "to the extent possible without revealing classified information," *Larson*, 565 F.3d at 684, the Second Hardy Declaration describes in specific detail the justifications for its *Glomar* response and demonstrates that the information withheld (that is, the existence or non-existence of other material responsive to Plaintiff's request) logically falls within Exemption 1. *See Larson*, 565 F.3d 864 ("The agency's affidavit also demonstrates that the withheld cables logically fall within the exemption, that is, that they are properly classified in the interest of national security.").

It is plausible that either confirming or denying the existence, or non-existence, of any other records responsive to Plaintiff's request, which regards a foreign national, could reasonably be expected to damage intelligence sources and methods by revealing Defendant's investigative interests and priorities, which could be used by foreign intelligence actors in employing counterintelligence measures. *See Wolf*, 473 F.3d at 376–77 ("It is plausible that either confirming or denying an Agency interest in a foreign national reasonably could damage sources and methods

11

by revealing CIA priorities, thereby providing foreign intelligence sources with a starting point for applying countermeasures against the CIA and thus wasting Agency resources."). "Indeed, '[a court] must take into account that each individual piece of intelligence information, much like a piece of jigsaw puzzle, may aid in piecing together other bits of information.'" *Id.* at 377 (quoting *Fitzgibbon v. C.I.A.*, 911 F.2d 755, 763 (D.C. Cir. 1990)) (alterations omitted). Moreover, it is plausible that either confirming or denying the existence and/or non-existence of any other records responsive to Plaintiff's request could reasonably be expected to harm foreign relations for the reasons outlined above. To the extent that any further justification is necessary, Defendant's *Glomar* response is "amply justified by the *in camera*, *ex parte* declaration submitted by the FBI." *Mobley v. C.I.A.*, 806 F.3d 568, 582 (D.C. Cir. 2015).

Nor has Plaintiff provided any "evidence to the contrary or evidence suggesting bad faith on the part of" Defendant, *Larson*, 565 F.3d at 864, especially as the Declaration provides that Mr. Hardy's determinations were "not made to conceal violations of law, inefficiency, or administrative error; to prevent embarrassment to a person, organization, or agency; to restrain competition; or to prevent or delay the release of information that does not require protection in the interests of national security," Second Hardy Decl. ¶ 23. Accordingly, the Court finds that Defendant's *Glomar* response here was justified under FOIA Exemption 1.

### 2. Exemption 3

The Court also considers whether the *Glomar* response was justified under FOIA Exemption 3. Exemption 3 applies to matters that are "specifically exempted from disclosure by statute, if that statute" both "(A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and (B) if enacted after the date of enactment

of the OPEN FOIA Act of 2009, specifically cites to this paragraph."   5 U.S.C. § 552(b)(3).

Defendant here relies on the National Security Act of 1947 ("NSA"), as amended by the

Intelligence Reform and Terrorism Prevention Act of 2004 ("IRTPA"), to justify its *Glomar*

response under Exemption 3.   Second Hardy Decl. ¶ 26.   Specifically, the NSA exempts

"intelligence sources and methods from unauthorized disclosure."  50 U.S.C. § 3024(i)(1).  It is

undisputed that 50 U.S.C. § 3024(i)(1) is an "exemption statute."  *Larson*, 565 F.3d at 865; *see*

*also Fitzgibbon*, 911 F.2d at 761 ("There is thus no doubt that section 403(d)(3) [which is now

50 U.S.C. § 3024(i)(1)] is a proper exemption statute under exemption 3.").   Indeed, the Supreme

Court has recognized that in enacting this statute, Congress gave the relevant agencies "broad

power to control the disclosure of intelligence sources."  *C.I.A. v. Sims*, 471 U.S. 159, 173 (1985).

"The Supreme Court has construed the relevant language of the NSA to protect 'all sources

of intelligence that provide, or are engaged to provide, information the [a]gency needs to perform

its statutory duties with respect to foreign intelligence.'"  *Shapiro v. United States Dep't of Justice*,

239 F. Supp. 3d 100, 122 (D.D.C. 2017) (quoting *Sims*, 471 U.S. at 169–70).   Moreover,

"Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the

detailed factual contents of specific documents," as instead "the sole issue for decision is the

existence of a relevant statute and the inclusion of withheld material within that statute's

coverage."  *Goland v. C.I.A.*, 607 F.2d 339, 350 (D.C. Cir. 1978).   Accordingly, the remaining

question is "whether or not the material withheld falls within the exemption claimed—i.e., whether

it relates to intelligence sources and methods."  *Fitzgibbon*, 911 F.2d at 762; *see Larson*, 565 F.3d

at 865 ("Thus, our only remaining inquiry is whether the withheld material relates to intelligence

sources and methods.").

13

Here, the Second Hardy Declaration provides that "[t]he FBI has found that any records responsive to Plaintiff's request that relate to FBI efforts to investigate threats to national security and/or gather foreign intelligence would, by their nature, be related to FBI intelligence sources and methods."  Second Hardy Decl. ¶ 24.  Furthermore, as detailed above, the Declaration provides additional information regarding the harm that could reasonably be expected to damage intelligence sources and methods.  For the same reasons as discussed above, and according substantial weight to Defendant's Second Hardy Declaration and the *In Camera, Ex Parte* Declaration of David M. Hardy, the Court finds that Exemption 3 further justifies Defendant's second *Glomar* response here.  *See Larson*, 565 F.3d at 865; *Wolf*, 473 F.3d 378.

Accordingly, the Court finds that the Second Hardy Declaration and the *In Camera, Ex Parte* Declaration of David M. Hardy have carried Defendant's burden of showing that Exemptions 1 and 3 justify its *Glomar* response.  *See New York Times v. Cent. Intelligence Agency*, No. 18-2112-CV, 2020 WL 3863087, at *3 (2d Cir. July 9, 2020).

### 3. Exemptions 6 and 7

Lastly, the Court considers the application of Exemptions 6 and 7.  Exemption 6 exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Exemption 7(C) exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."  *Id.* § 552(b)(7)(C).

Exemption 6 is not limited to "a narrow class of files containing only a discrete kind of personal information[,]" but was "intended to cover detailed Government records on an individual

which can be identified as applying to that individual." *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982). Fundamentally, "Exemption 6 is designed to protect personal information in public records." *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1228 (D.C. Cir. 2008) (internal quotation marks omitted). Assuming that the records at issue are of the type that fall within the ambit of Exemption 6, "the court must then determine whether their disclosure would constitute a clearly unwarranted invasion of personal privacy, which requires balancing the privacy interest that would be compromised by disclosure against any public interest in the requested information." *Wisdom v. U.S. Tr. Program*, 266 F. Supp. 3d 93, 108 (D.D.C. 2017) (internal quotation marks omitted). In order for the exemption to apply, the Court must determine that the "disclosure of the files would compromise a substantial, as opposed to de minimis, privacy interest, because if no significant privacy interest is implicated FOIA demands disclosure." *Multi Ag Media*, 515 F.3d at 1229 (internal quotation marks and alterations omitted). On the other side of the equation, "the only relevant public interest in disclosure to be weighed . . . is the extent to which disclosure would serve the core purpose of the FOIA, which is contributing significantly to public understanding of the operations or activities of the government." *U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510 U.S. 487, 495 (1994) (internal quotation marks and alterations omitted).

The same balancing test applies to Exemption 7(C). However, "Exemption 7(C) is more protective of privacy than Exemption 6 and thus establishes a lower bar for withholding material." *Prison Legal News v. Samuels*, 787 F.3d 1142, 1147 n.5 (D.C. Cir. 2015) (internal quotation marks omitted). That is because "Exemption 7(C)'s privacy language is broader than the comparable language in Exemption 6 in two respects." *U.S. Dep't of Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 756 (1989). "First, whereas Exemption 6 requires that the invasion of

privacy be 'clearly unwarranted,' the adverb 'clearly' is omitted from Exemption 7(C) . . . Second, whereas Exemption 6 refers to disclosures that 'would constitute' an invasion of privacy, Exemption 7(C) encompasses any disclosure that 'could reasonably be expected to constitute' such an invasion." *Id.* In the context of Exemption 7(C), this circuit has recognized that "individuals have a strong interest in not being associated unwarrantedly with alleged criminal activity." *Stern v. FBI*, 737 F.2d 84, 91–92 (D.C. Cir. 1984).

Furthermore, to withhold documents pursuant to Exemption 7(C), the agency must make a threshold showing that the "the records were compiled for a law enforcement purpose." *Pinson v. U.S. Dep't of Justice*, 245 F. Supp. 3d 225, 249 (D.D.C. 2017) (internal quotation marks omitted). "A court's review of this threshold question is 'necessarily deferential,' but is 'not vacuous.'" *Id.* (citing *Pratt v. Webster*, 673 F.2d 408, 421 (D.C. Cir. 1982)). "The law-enforcement-purpose inquiry focuses on how and under what circumstances the requested files were compiled, and whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding." *Bartko v. U.S. Dep't of Justice*, 898 F.3d 51, 64 (D.C. Cir. 2018) (internal quotation marks omitted). "To establish a law enforcement purpose, [the FBI's] declarations must establish (1) a rational nexus between the investigation and one of the agency's law enforcement duties; and (2) a connection between an individual or incident and a possible security risk or violation of federal law." *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 926 (D.C. Cir. 2003) (internal quotation marks omitted). While not every document compiled by a law enforcement agency, such as the FBI, is compiled for a law enforcement purpose, *see Vymetalik v. FBI*, 785 F.2d 1090, 1095 (D.C. Cir. 1986) ("FBI records are not law enforcement records simply by virtue of the function that the FBI serves."), "[c]ourts generally afford some deference

to agencies 'specializing in law enforcement' that claim their records are eligible for Exemption 7(C) protection.'"  *Bartko*, 898 F.3d at 64.

Because Exemption 6 and Exemption 7(C) have different threshold requirements, the Court will consider Defendant's *Glomar* response with respect to Exemption 7(C).  *See Roth*, 642 F.3d at 1173 ("If the information withheld here was 'compiled for law enforcement purposes,' thus implicating Exemption 7(C), then we would have no need to consider Exemption 6 separately because all information that would fall within the scope of Exemption 6 would also be immune from disclosure under Exemption 7(C).").

### i. Threshold Inquiry—Law Enforcement Purpose

The Court first considers whether any records, should such records exist, would have been compiled for a law enforcement purpose.  The Second Hardy Declaration provides that "any FBI records of contact between Mr. Hage and U.S. government officials, should such records exist, would logically be investigative in nature."  Second Hardy Decl. ¶ 10; *see also id.* ¶ 14 ("Any records responsive to Plaintiff's request would implicate an investigative interest by the FBI in Mr. Hage or some facet of his activities.").  This assertion is deserving of deference.  *See Bartko*, 898 F.3d at 64.

### ii. Balancing of Privacy and Public Interests

Next, the Court considers whether disclosure regarding the existence or non-existence of records "could reasonably be expected to constitute an unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(7)(C), which, as noted above, involves balancing the public interest in disclosure against the privacy interest that would be compromised, *see Roth*, 642 F.3d at 1174.

First are the privacy interests of Mr. Hage.[3]  In this circuit, courts have "long recognized" that "mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation."  *Id.*  "Individuals have an obvious privacy interest cognizable under Exemption 7(C) in keeping secret the fact that they were subjects of a law enforcement investigation."  *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, 746 F.3d 1082, 1091 (D.C. Cir. 2014) (internal quotation marks and alteration omitted).  When a FOIA request is made for FBI records regarding a particular person, "the FBI's mere acknowledgment that it possesses responsive records associates the individual named in the request with suspected criminal activity and therefore a Glomar response may be appropriate."  *Id.*  In this vein, the Second Hardy Declaration outlines at length the "serious privacy implications" that may arise from "revealing FBI interest in individuals" such as Mr. Hage, if any such interest were to exist.  Second Hardy Decl. ¶¶ 15–16.  The Court agrees with Defendant that Mr. Hage has a strong privacy interest here in not being associated with any FBI investigative records, if any such records were to exist.

Second is the public interest at stake.  As previously explained, "[t]he only relevant public interest in the FOIA balancing analysis [is] the extent to which disclosure of the information sought would shed light on an agency's performance of its statutory duties' or otherwise let citizens know what their government is up to."  *Citizens for Responsibility & Ethics in Washington*, 746 F.3d at 1093 (internal quotation marks and alteration omitted).  "It is a FOIA requester's obligation to articulate a public interest sufficient to outweigh an individual's privacy interest, and the public interest must be significant."  *Petrucelli v. Dep't Of Justice*, 51 F. Supp. 3d 142, 164 (D.D.C.

---

[3] Here, Defendant asserts, and Plaintiff does not dispute, that Plaintiff has not produced a privacy waiver form or proof of death for Mr. Hage.  *See* Second Hardy Decl. ¶ 14.

2014).  Plaintiff may satisfy his burden by "showing (1) that 'the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake,' and (2) that the information he seeks 'is likely to advance that interest.'"  *Roth*, 642 F.3d at 1175.

Here, Plaintiff suggests that there is a "significant public interest favoring disclosure of these records."[4]  Pl.'s Opp'n and Mem. at 13.  He incorporates by reference the declaration that he submitted in support of his first motion for summary judgment, in which he indicated that:

> The general purpose of my May 18, 2016 FOIA request to the FBI described above was to obtain additional information for my ongoing research as to international diplomacy and the Iraq military conflict. In particular, the primary purpose for this FOIA request was (and is) to follow-up on information that was reported in several national news articles, reporting that a Lebanese national, identified as Mr. Imad Hage, had attempted to serve as a diplomatic intermediary in between the United States and Iraq. These news reports indicate that the FBI conducted an investigation of Mr. Hage, following a January 28, 2004 incident at Dulles Airport, and that this FBI investigation included FBI contacts with U.S. officials involved with Mr. Hage's diplomatic efforts.

Decl. of David Austin Lindsey ("Lindsey Decl."), ECF No. 12-2, at ¶ 4 (citation omitted).  While this explains Plaintiff's reasoning behind his FOIA request, it is not clear what exactly the public interest to be served is.  By citing to this, Plaintiff seems to suggest that disclosure here would provide information to citizens regarding the government's actions related to "international diplomacy and the Iraq military conflict."[5]  *Id.*; *see* Pl.'s Opp'n and Mem. at 13.  Although the Court agrees that there is a public interest in having such information, it is far from clear that

---

[4] Again, despite Plaintiff's language here, Defendant has neither confirmed nor denied that there are any records other than those acknowledged and processed relating to the January 2003 Dulles Airport incident.

[5] Defendant notes in its briefing that Plaintiff may have at one time argued that there was misconduct at issue here.  *See* Def.'s Mem. at 25.  However, Plaintiff has not asserted that or provide evidence related to it here, nor does it appear that he has referenced any earlier submission of his that argued this is part of the public interest at stake.  The Court therefore does not consider this argument here.

Plaintiff has satisfied his burden here, as he barely touches on the public interest in either his brief or the incorporated declaration.  In other words, Plaintiff has not really explained how public disclosure here would "contribute significantly to public understanding of the operations or activities of the government."  *Reporters Comm. For Freedom of Press*, 489 U.S. at 775 (internal quotation marks omitted).  Even if Plaintiff had done so, however, based upon the representations in the declarations submitted by Defendant, the Court finds that the public interest identified by Plaintiff is outweighed here by the particularly strong privacy interests outlined above.

Plaintiff argues that the privacy interests of Mr. Hage have been diminished here due to Mr. Hage's statements to the media, Lindsey Decl. ¶ 4; *id.* Ex. B–F, and based on a declaration of Mr. Hage's filed in a criminal case in the United States District Court for the Eastern District of Virginia, *United States v. Imad Hage*, Crim. Action No. 04-162.  Pl.'s Reply Ex. 1 ("Hage Decl."), ECF No. 27-1.  Neither, however, persuades the Court that the balance here weighs in favor of public disclosure and that Defendant's second *Glomar* response was not justified.

As for Plaintiff's first argument, Mr. Hage made several statements to the media.  For example, he seemingly asserted that he had a "go-between" role "for senior Iraqi officials who were trying to approach the United States with a last-minute offer to avert the U.S.-led invasion that began March 20."  Lindsey Decl. Ex. B (March 4, 2004 AP News Article) at 1; *see also id.* Ex. B at 1 (stating this was his role); *id.* Ex. C (Dec. 11, 2003 AP News Article) at 1 (describing his role as "intermediary between Baghdad and Washington before the war in Iraq"); *id.* Ex. C at 2 (providing additional details from Mr. Hage regarding his role); *id.* Ex. D (explaining that Mr. Hage "acted as an intermediary between Baghdad and Washington before the war in Iraq") at 1; *id.* Ex. E (Nov. 5, 2003 Newsweek Article) at 1 (describing Mr. Hage as "wealthy Lebanese–American businessman who was trying to set up back-channel talks with senior aides to Saddam

Hussein to avert a war in Iraq"); *id.* Ex. F (Nov. 5, 2003 Knight Ridder Article) at 1 (discussing Mr. Hage's role as intermediary).  The articles submitted by Plaintiff also note that Mr. Hage was "stopped at Dulles International Airport outside Washington."  *Id.* Ex. B at 1; *see id.* Ex. C at 1; *id.* Ex. D at 1–3; *id.* Ex. E at 1; Ex. F at 2.  One article claims that he was "questioned by FBI agents," *id.* Ex. E at 1, although the Second Hardy Declaration clarifies that while Mr. Hage was detained, "he was not arrested by the FBI or Customs and Border Patrol," Second Hardy Decl. at 4 n.2.

While Mr. Hage's statements diminish his privacy interest in some respects, his statements do not diminish his privacy interests in the broad manner that Plaintiff asserts.  Indeed, any diminishment is narrow: Assuming that he made these statements to media sources, he stated that he played a role as an intermediary, potentially provided details regarding that role, and that he was detained at the airport and questioned by some law enforcement officials there.  He does not necessarily, however, admit that he was a subject of investigative interest to the FBI following his detention at the airport or regarding his alleged role as an intermediary.  Furthermore, Defendant recognizes that in light of these statements, some of Mr. Hage's privacy interests relating to his detainment were diminished, and for that reason did search and produce documents related to the January 2003 Dulles Airport Incident.  *See* Def.'s Reply at 5.  In other words, Defendant has already taken this diminishment into account and issued a second *Glomar* response neither confirming nor denying any other records responsive to Plaintiff's request outside of those documents already searched and produced relating to the January 2003 Dulles Airport Incident. The Court therefore agrees that any diminishment of his privacy interests does not change the balance analysis above as to any other records, if such records were to exist.

The same is true of Mr. Hage's Declaration.  He states in the Declaration that he was "detained, locked up and interrogated at length."  Hage Decl. ¶ 4.  He also states at another point that he was "forcibly  detained and questioned by numerous Government agents; handcuffed and taken from the terminal to a separate building with a security facility and locked up; then freed to continue" to his flight.  *Id.* ¶ 9.  He claims that he was questioned by FBI agents at the airport as well as "possibly" other law enforcement agents.  *Id.* ¶ 23.  Moreover, Mr. Hage describes his role as an intermediary.  *See id.* ¶¶ 6, 15–18, 25.

Although Mr. Hage provided more detail in this Declaration than contained in some of the news articles, all the information concerns the same incident, and thus does not constitute a broad diminishment of Mr. Hage's privacy interests.  While Mr. Hage states that he was questioned by the FBI (which, again, is disputed by Defendant here), he does not claim that he was further investigated by the FBI or that he was of investigative interest to the FBI prior to or following his detainment.  If anything, his statements may constitute a diminishment of his privacy interests specifically with respect to the January 2003 Dulles Airport Incident.  But, as noted above, Defendant admits this and has taken it into account by searching and producing documents related to that incident based on this narrow diminishment.  *See* Def.'s Reply at 5.  Defendant's second *Glomar* response at issue here did not encompass those documents.  Second Hardy Decl. ¶ 9.  The Court agrees that any diminishment is narrow and that otherwise his privacy interests are not diminished.  In that case, his strong privacy interests still outweigh the public interest identified by Plaintiff here.  Alternatively, even if his privacy interests were more broadly diminished, the Court found above that Defendant's *Glomar* response was also justified under Exemptions 1 and 3.

### iii. Plaintiff's Other Arguments

Plaintiff further challenges Defendant's response on the basis that it issued the *Glomar* response without asserting that it "locat[ed] and review[ed] any of the responsive records, to determine if in fact a *Glomar* response should apply in the particular instance to all portions of each responsive record."  Pl.'s Opp'n and Mem. at 13; *see also* Pl.'s Opp'n and Mem. at 7 (arguing that Defendant's follow-up search was too narrow).  First, this argument misses the mark:  in light of its *Glomar* response, Defendant has not confirmed or denied whether there are, or are not, "responsive record[s]" as Plaintiff claims, other than those acknowledged records pertaining to the January 2003 Dulles Airport incident.  Regardless, despite Plaintiff's assertions, "to the extent the circumstances justify a *Glomar* response, the agency need not conduct any search for responsive documents or perform any analysis to identify segregable portions of such documents."  *PETA*, 745 F.3d at 540; *see also Elec. Privacy Info. Ctr.*, 678 F.3d at 934 (explaining that because the court found a submitted declaration "sufficient to support" *Glomar* response, requiring the agency "to conduct a search and segregability analysis would be a meaningless—not to mention costly— exercise"); *Wheeler v. C.I.A.*, 271 F. Supp. 2d 132, 141 (D.D.C. 2003) ("'When the Agency's position is that it can neither confirm nor deny the existence of the requested records, there are no relevant documents for the court to examine other than the affidavits which explain the Agency's refusal.'" (quoting *Phillippi v. C.I.A.*, 546 F.2d 1009, 1013 (D.C. Cir. 1976)).  The Court accordingly rejects Plaintiff's argument as to this point.

Lastly, Plaintiff argues that the balancing analysis cannot be performed categorically but "must be performed on a document by document basis."  Pl.'s Opp'n and Mem. at 13.  For starters, in light of Defendant's second *Glomar* response, it has not identified whether there are—or are not—any other responsive documents.  Nor does Defendant need to conduct any search when its

*Glomar* response is justified, as explained above.  In addition, in making this argument, Plaintiff overlooks one of the primary purposes of a *Glomar* response.  As Defendant's declaration explains, for a *Glomar* response "[t]o be credible and effective, the FBI must use a *Glomar* response in all similar cases, regardless of whether responsive records actually exist."  Second Hardy Decl. ¶ 9. If Defendant were to only issue *Glomar* responses "when it actually possessed responsive records, the *Glomar* response would be interpreted as an admission that responsive records exist."  *Id.*  This may ultimately result in the very harms that a *Glomar* response is aimed at protecting.  The Court has reviewed both Defendant's public declaration as well as its *in camera*, *ex parte* declaration submitted by Defendant, which indicate that Defendant has made a sufficiently "particularized showing" regarding the interests at stake.  *Citizens for Responsibility & Ethics in Washington*, 746 F.3d at 1096.

At bottom, even if any additional showing was required to justify the second *Glomar* response under Exemption 7(C) as to any of the above requirements or arguments, the *in camera*, *ex parte* declaration submitted by Defendant would provide it.  *BuzzFeed, Inc. v. Dep't of Justice*, 344 F. Supp. 3d 396, 405, 407 (D.D.C. 2018) (finding that *Glomar* response was justified under Exemptions 7(A) and 7(E) based on court's review of "both the public and the classified declarations").  Accordingly, upon consideration of the Second Hardy Declaration and Defendant's *in camera*, *ex parte* declaration, the Court finds that Defendant's second *Glomar* response was justified by Exemption 7(C) in addition to Exemptions 1 and 3.

**B. Scope and Adequacy of the Search Pertaining to January 2003 Dulles Airport Incident and Request for *In Camera* Review**

In addition to taking issue with Defendant's second *Glomar* response, Plaintiff questions the scope and adequacy of Defendant's search relating to the January 2003 Dulles Airport incident and asks that this Court review certain documents *in camera*.

### 1. Scope of the Search

First, Plaintiff argues that the scope of Defendant's search was too narrow.  *See* Pl.'s Opp'n and Mem. at 7–8.  However, Defendant issued a second *Glomar* response as to all records except the acknowledged records recording the January 2003 Dulles Airport incident, Second Hardy Decl. ¶¶ 8–9, and the Court found above that response was justified under FOIA Exemptions 1, 3, and 7(C).  Therefore, to the extent that Plaintiff's argument is aimed at Defendant's tailoring of its search in light of the second *Glomar* response, the above analysis also applies.  *See supra* Section II.A.3 (discussing Defendant's search obligations in light of *Glomar* response).

In making this argument, moreover, Plaintiff relies upon this Court's prior September 20, 2017 Memorandum Opinion and Order, ECF No. 16, in this case, which Plaintiff asserts found that Defendant "had a duty to conduct a search to locate all responsive records within the full scope of Plaintiff's FOIA request" and that Defendant "could not limit its search actions to limited portions of the record request that are of heightened interest over others."  Pl.'s Opp'n and Mem. at 7; *see also id.* at 2 (emphasizing "this Court's express discussion of the broader scope of Plaintiff's FOIA Request in the September 20, 2017 Memorandum Opinion and Order").  However, there is nothing to indicate that Defendant has limited its follow-up search other than

any tailoring it may have implemented in light of the second *Glomar* response.[6]  For instance, the Second Hardy Declaration explains the adequacy of the search as related specifically "to those portions of Plaintiff's request concerning Mr. Hage's detainment at Dulles International Airport in January 2003."  Second Hardy Decl. ¶ 37, n.13.  Unlike discussed with respect to its last motion for summary judgment, Defendant's narrowed search was not the result of discussions with Plaintiff or a questionable interpretation of Plaintiff's request, *see* Sept. 20, 2017 Mem. Op. and Order, ECF No. 16, at 8–9, but instead a natural outgrowth of its second *Glomar* response.  Accordingly, in light of Defendant's justified second *Glomar* response, this was not too narrow of a search.

### 2. Adequacy of the Search

Second, Plaintiff argues that Defendant's search specifically as related to the January 2003 Dulles Airport incident was inadequate.[7]  Before analyzing the adequacy of Defendant's narrowed search, the Court will explain the steps taken in conducting the search relating to the January 2003 Dulles Airport incident.[8]   In response to this Court's prior Order in this case, the

---

[6] Plaintiff points to Defendant's determination that 398 pages of the approximately 400 pages of material initially identified as potentially responsive to Plaintiff's request were in fact non-responsive as evidence that its search was too narrow.  *See, e.g.*, Pl.'s Mem. at 8.  However, Defendant made clear in its reply that those 400 documents "were not subject to the FOIA exemptions and the Glomar response."  Def.'s Reply at 4.  In other words, it appears that the initial search returned results that Defendant ultimately determined were not responsive to Plaintiff's request, which Defendant narrowed to encompass solely the January 2003 Dulles Airport incident in light of its *Glomar* response.  *See* Second Hardy Decl. ¶ 38.  Consequently, these pages, according to Defendant, were not excluded because Defendant narrowed its search in the manner that Plaintiff seems to suggest.  *See, e.g.*, Pl.'s Mem. at 3 n.2.

[7] Defendant produced two pages of responsive material with redactions, which were implemented pursuant to FOIA Exemptions 3 and 7.  Second Hardy Decl. ¶¶ 40–49; *id.* Ex. I.  As Plaintiff does not dispute that these specific redactions were justified under Exemptions 3 and 7, the Court does not consider the exemptions here.

[8] Again, Defendant has neither confirmed nor denied the existence of any other records concerning Mr. Hage or otherwise responsive to Plaintiff's request.  The search that Defendant describes

Record/Information Dissemination Section ("RIDS") conducted an index search in the Central

Records System. Second Hardy Decl. ¶¶ 37–38. Defendant searched for Plaintiff's name, "Imad

Hage," and "Imad E. Hage." *Id.* This included a "three-way phonetic breakdown of" his name.

*Id.*; *id.* at 20 n.14; Def.'s Reply at 4.

The Central Records System ("CRS") "is an extensive system of records" that includes

numerous types of files, including investigative and personnel files, "compiled and maintained by

the FBI." Second Hardy Decl. ¶ 30. These documents span the entire FBI organization. *Id.*

Because there is an "enormous amount of information contained in the CRS," it is indexed "in a

manner which meets the FBI's investigative needs and priorities" and that "allows FBI personnel

to reasonably and adequately locate pertinent files." *Id.* ¶ 32. There are two types of entries in the

general indices, which "comprise an index on a variety of subject matters" including "individuals,

organizations, events, or other subjects of investigative interest"—main entries and reference

entries. *Id.* Main entries "pertain[ ] to records indexed to the main subject(s) of a file," while

reference entries are records that "merely mention or reference an individual, organization, or other

subject matter" that is contained in a main entry. *Id.* The search conducted here included "records

maintained in FBIHQ as well as all" field offices. *Id.* ¶ 38.

In conducting a search of the CRS, RIDS employed a specific application: the Universal

Index ("UNI"), which is "the automated index of the CRS and provides all offices of the FBI a

centralized, electronic means of indexing pertinent investigative information to FBI files for future

retrieval via index searching." *Id.* ¶ 35. UNI also searches prior automated indices, so that a search

employing it encompasses data that was indexed into prior automated systems before 1995, which

---

"relates only to those portions of Plaintiff's request concerning Mr. Hage's detainment at Dulles
International Airport in January 2003." Second Hardy Decl. ¶ 37, n.13.

it when UNI was implemented.  *Id.*  As of the date of the Second Hardy Declaration, UNI consisted

of approximately 118.5 million searchable records.  *Id.*  Moreover, the search conducted by RIDS

was "a Sentinel index search."  *Id.* ¶ 38.  Defendant's declaration explains that "Sentinel is the

FBI's next generation case management system" as of mid-2012.  *Id.* ¶ 36.  Information from

Sentinel is replicated into ACS and thus builds on ACS.  *Id.*  It simply "provides another portal to

locate information within the vast CRS for FBI records generated on or after July 1, 2012."  *Id.*

Since the Dulles Airport incident occurred in January 2003, Defendant expected that any related

records would be found in CRS.  *Id.* ¶ 39.

After the search was run, Defendant used information from Plaintiff's request letter and

the attached news articles, including "the subject's age and other identifying information," to

identify potentially responsive records.  *Id.* ¶ 38.  Defendant therefore initially identified

"approximately 400 pages of potentially responsive material."  *Id.*  But additional review revealed

that "only two (2) pages were responsive to Plaintiff's request," which, as explained above,

Defendant had narrowed in light of its second *Glomar* response.  *Id.*

Based on Defendant's submitted declarations, the Court finds that the search conducted

was sufficient.  "The Court applies a 'reasonableness' test to determine the 'adequacy' of search

methodology . . . consistent with the congressional intent tilting the scale in favor of disclosure."

*Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 27 (D.C. Cir. 1998) (internal citation omitted).  An

agency "fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its

search was reasonably calculated to uncover all relevant documents."  *Ancient Coin Collectors*

*Guild v. U.S. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011) (internal quotation marks omitted).

The agency may submit affidavits or declarations to explain the method and scope of its search

and such affidavits or declarations are "accorded a presumption of good faith, which cannot be

rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotation marks omitted). However, if the record "leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper." *Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990).

Here, Defendant searched its most comprehensive records systems using search terms related to Mr. Hage, and in particular numerous variations on his name. It then used additional information from Plaintiff's submissions to determine whether records were responsive to Plaintiff's request. Its declaration asserts that it "conducted a search reasonably calculated to locate records responsive to Imad Hage's detainment at Dulles International Airport in January 2003." Second Hardy Decl. ¶ 39. There is nothing to indicate that the declarations submitted by Defendant were submitted in bad faith, and the Court therefore affords them the presumption of good faith. *See SafeCard Servs.*, 926 F.2d at 1200 (explaining that agency declarations are accorded a presumption of good faith in relation to the adequacy of a search). Plaintiff's primary argument on why the search was inadequate is that Defendant improperly narrowed its search to the January 2003 Dulles Airport incident. However, as explained above, *see supra* Section II.B.1, the Court has found that the narrowing of the search was appropriate in light of Defendant's second *Glomar* response.

Plaintiff's secondary argument is that Defendant had a "duty to perform necessary follow-up search actions" based on statements in the Newsweek article submitted by Plaintiff as evidence in the last round of summary judgment briefing. *See* Pl.'s Opp'n and Mem. at 8. Even if the statements were made as Plaintiff alleges, however, he has failed to explain how Defendant's search as outlined in the Second Hardy Declaration would not include any documents related to

these statements.[9]   The Declaration indicates that Defendant used information from this news article to conduct the search.  Second Hardy Decl. ¶ 38; *see* Def.'s Reply at 4.  Although Plaintiff cites to *Kleinert v. Bureau of Land Management*, 132 F. Supp. 3d 79 (D.D.C. 2015) in support of his argument, that case is inapposite.  The court there required additional information from the defendant because it provided insufficient information to determine whether the search was adequately conducted but it did not require additional follow-up on any "leads," like Plaintiff claims.  *See id.* at 88.  Even so, the declarations submitted here provide sufficient information to determine that Defendant's search was adequate.  Furthermore, to the extent Plaintiff is again challenging Defendant's narrowing of the search in light of its second *Glomar* response, his argument is again futile.  The Court is therefore unpersuaded that there was bad faith or that Defendant's search was inadequate.

### 3. In Camera Review Is Not Warranted

Third, Plaintiff questions Defendant's determination that 398 pages of the approximately 400 pages initially identified as responsive to Plaintiff's request were actually nonresponsive.  *See* Pl.'s Opp'n and Mem. at 3 n.2; *id.* at 9.  Plaintiff requests that the Court review these pages *in camera* to determine "if any of these additional records (beyond the two pages that were provided) may also contain non-exempt information that is responsive to Plaintiff's FOIA Request."  Pl.'s Opp'n and Mem. at 9; Pl.'s Reply at 4.

"FOIA provides district courts the option to conduct in camera review, but 'it by no means compels the exercise of that option.'"  *Larson*, 565 F.3d at 869 (internal citations omitted) (quoting *Juarez v. Dep't of Justice*, 518 F.3d 54, 60 (D.C. Cir. 2008)); *see* 5 U.S.C. § 552(a)(4)(B).  *In*

---

[9] Plaintiff does not claim that these statements constitute official acknowledgement of any records. *See* Pl.'s Opp'n and Mem. at 8–9.  The Court therefore does not consider that argument here.

*camera* review is appropriate when such review is necessary for a district court "to make a responsible de novo determination on the claims of exemption." *Juarez*, 518 F.3d at 60 (internal quotation marks omitted). "When the agency meets its burden by means of affidavits, in camera review is neither necessary nor appropriate." *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1387 (D.C. Cir. 1979). But "affidavits will not suffice if the agency's claims are conclusory, merely reciting statutory standards, or if they are too vague or sweeping." *Id.* "In camera inspection is particularly a last resort in national security situations like this case—a court should not resort to it routinely on the theory that it can't hurt." *Larson*, 565 F.3d at 870 (internal quotation marks and citations omitted). Review "may be particularly appropriate when either the agency affidavits are insufficiently detailed to permit meaningful review of exemption claims or there is evidence of bad faith on the part of the agency, when the number of withheld documents is relatively small, and when the dispute turns on the contents of the withheld documents, and not the parties' interpretations of those documents." *Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 996 (D.C. Cir. 1998) (internal quotation marks omitted).

*In camera* review is not warranted here. Plaintiff "points to no record evidence of bad faith." *Mobley*, 806 F.3d at 588. Plaintiff suggests that the FBI's ultimate production of two pages "is extremely questionable and suspect." Pl.'s Reply at 4. That is not so, however, in light of Defendant's initial broad searching procedures outlined above, *see supra* Section II.B.2; Second Hardy Decl. ¶¶ 30–39, and considering its justified second *Glomar* response. Moreover, Plaintiff does not even question here Defendant's exemptions—it questions Defendant's determination that records were not responsive based on the news articles and information that Plaintiff himself provided. *See* Second Hardy Decl. ¶ 38. And though Plaintiff claims otherwise, 398 pages of material is not a "relatively small" amount. *Spirko*, 147 F.3d at 996. Lastly, as the Court has

explained above that the agency declarations here described with sufficient detail the justifications for its search methodology, the Court finds that *in camera* review would be inappropriate here. *See Boyd v. Criminal Div. of U.S. Dep't of Justice*, 475 F.3d 381, 391 (D.C. Cir. 2007) (affirming district court's decision not to view documents *in camera* because party had not "demonstrated that the agencies failed to provide sufficiently detailed affidavits, nor offered evidence of bad faith"). Accordingly, the Court will not grant Plaintiff's request to review the material found to be non-responsive *in camera*.

### III. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Renewed Motion for Summary Judgment, ECF No. 20, and **DENIES** Plaintiff's Renewed Motion for Summary Judgment, ECF No. 22. In particular, the Court finds that based on both of Defendant's submitted declarations, Defendant met its adequate search obligations and that Defendant's second *Glomar* response was justified under FOIA Exemptions 1, 3, and 7(C).

An appropriate Order accompanies this Memorandum Opinion.

**Date:** September 18, 2020                    ___/s/_____
                                                                    COLLEEN KOLLAR-KOTELLY
                                                                    United States District Judge